MAY, J.
A dispute over a local union’s real estate investment sets the stage for this appeal. The plot pits the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, its Territories, and Canada Local 500 (Local 500), against the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators Holding Company, Inc., and its officers (Holding Company). The scene is Local 500’s appeal of a judgment for the Holding Company. It argues the trial court erred in instructing the jury concerning the law on resulting trusts and refusing to submit a special interrogatory verdict form to the jury. We find no error and affirm.
In 1927, members of the theatrical industry of Fort Lauderdale, Boca Raton, and Hollywood, Florida, a collection of movie projectionists, stagehands, and technicians, joined to form and charter Local Union 646 (Local 646). Around 1966, the members of Local 646 decided to purchase a piece of real estate in Fort Lauderdale. Paul Robinson and Virgil Bender, both members of Local 646, found a parcel of land to purchase.
Prior to purchasing the property, Robinson sought legal advice on how to protect the property from acquisition by other unions that may try to take over Local '646. The members voluntarily contributed funds for the down payment on the property. On the advice of counsel, Robinson took out a mortgage in his own name, as trustee for the members of Local 646. He *962 also obtained another purchase money mortgage in his own name. Local 646 did not agree to indemnify Robinson in the event of a default.
Two buildings were located on the acquired property, a 1,400 square foot laundromat and a 1,500 square foot structure. The members planned to use the larger building for meetings and apply the rent proceeds from the laundromat toward the mortgage payments.
After closing on the property, the members of Local 646 formed the Holding Company to manage the property and secure it from any union takeover. The Holding Company was comprised of all members in good standing of Local 646. Once the Holding Company was formed, Robinson executed and delivered a warranty deed for the property to the Holding Company, which then assumed the mortgages. Local 646 did not agree to indemnify the Holding Company should there be a default on the mortgages.
To effectively meet the mortgage obligations, the members of Local 646 set up a building fund account, which was owned by the Holding Company. Local 646 and the other tenant paid rent into that account. The Holding Company paid the mortgage payments until satisfied in 1973, at which time the Holding Company discontinued its building fund account, and Local 646 ceased paying monthly rent. Local 646 denied that checks from its general operating fund were ever used to pay the mortgages.
In 1977, the members of Local 646 reestablished the building fund, in which it deposited rent proceeds from the other tenant. The account was also used by the Holding Company to pay property taxes and insurance, and make repairs on the property. The Holding Company operated the property without difficulty for more than three decades.
In 1999, Local 500, a New York union, relocated to South. Florida and began organizational meetings with other local theatrical unions. In January 2002, local unions 316, 545, 623, 646, 827, and 853, merged into Local 500.
Prior to the merger, the members of Local 646 inquired of Local 500 about the Holding Company’s property. Local 500 assured the members of Local 646 the property belonged to them and would not be affected by the merger. As part of the merger, Local 500 consolidated the accounts and assets of the local unions and began occupying the building previously used by Local 646.
Subsequent to the merger, Local 500 closed the accounts of Local 646, and changed the locks on the office doors. The Holding Company opened an account at a different bank to deposit rent proceeds and continued, to pay the property taxes, insurance, and utilities.
In April 2002, the Holding Company sent a letter to Local 500 requesting it sign a lease if it desired to continue to occupy the building. When Local 500 refused, the Holding Company sent a notice to Local 500 to vacate the premises within five days and pay overdue rent. Local 500 did not respond.
The Holding Company then filed a complaint against Local 500, alleging an unlawful entry and detention, which was later amended to add counts for ejectment and conversion, and to quiet title. Local 500 filed an answer, affirmative defenses, and counterclaim, alleging claims for declaratory relief, a resulting trust, a constructive trust, breach of fiduciary duty, conversion, ultra vires, and dissolution of the Holding Company. The parties filed a joint pretrial stipulation, which included an agreed upon jury instruction on the result *963 ing trust claim, and proposed verdict forms.[1]
After a seven-day jury trial, the trial court conducted a charge conference. Local 500 requested a presumption instruction on the resulting trust claim, and a special multi-part interrogatory verdict form. The court denied both requests. The jury returned a verdict for the Holding Company on all counts.
We review the trial court’s rulings on jury instructions to determine if prejudicial error occurred, i.e., error resulting in a miscarriage of justice. See Goldschmidt v. Holman, 571 So.2d 422 (Fla.1990). “A ‘miscarriage of justice’ arises where instructions are ‘reasonably calculated to confuse or mislead’ the jury.” Id. at 425 (quoting Fla. Power & Light Co. v. McCollum, 140 So.2d 569, 569 (Fla. 1962)).
Local 500 claims the trial court abused its discretion by refusing to instruct the jury on the “presumption” of a resulting trust, thereby misleading the jury on a critical issue. The Holding Company responds that no presumption arose because Local 500 failed to prove that Local 646 actually paid for the property. Alternatively, Local 646 argues that if a presumption arose, it vanished when Local 646 introduced contradicting evidence. To resolve the issue, we must review the law concerning the use of “presumptions” and how it applies to a claim for a resulting trust.
“Prior to the enactment of the Florida Evidence Code, courts explained a presumption as ‘an inference required by a rule of law to be drawn as to the existence of one fact from the existence of some other established basic fact or combination of facts.’ ” Ins. Co. of State of Pa. v. Estate of Guzman, 421 So.2d 597, 601 (Fla. 4th DCA 1982) (quoting Caldwell v. Div. of Ret., 372 So.2d 438, 440 (Fla.1979)). Florida recognizes two types of presumptions. The first type is the “vanishing” presumption.
Florida follows generally [albeit not always] what is sometimes called the Thayerian rule to the effect that when credible evidence comes into the case contradicting the basic fact or facts giving rise to the presumption, the presumption vanishes and the issue is determined on the evidence just as though no presumption has ever existed. Conversely, if the basic facts are sufficiently proven so as to give rise to the presumption and not thereafter contradicted by credible evidence, the party in whose favor the presumption exists becomes entitled to a directed verdict. Thus, in either event, the presumption is productive of these procedural consequences but is not a matter for the jury to consider.
Id. (quoting Caldwell, 372 So.2d at 440).
The second type of presumption, the “social policy” presumption, affects the burden of proof.
When evidence rebutting such a presumption is introduced, the presumption does not automatically disappear. It is not overcome until the trier of fact believes that the presumed fact has been *964 overcome by whatever degree of persuasion is required by the substantive law of the case.

Id.

 In essence, “[w]hen a presumption shifts the burden of proof, the presumption remains in effect even after evidence rebutting the presumption has been introduced and the jury must decide if the evidence is sufficient to overcome the presumption.” Dep’t of Agric. & Consumer Servs. v. Bonanno, 568 So.2d 24, 31 (Fla. 1990) (citing Pub. Health Trust v. Valcin, 507 So.2d 596 (Fla.1987)). These presumptions are expressions of social policy; e.g., the validity of marriage, sanity in civil cases, legitimacy of a child born in wedlock, and the correctness of judgments. ‘See C. Ehrhardt, Florida Evidence 68-79 (2d ed. 1984).
To determine if the presumption of a resulting trust is either a “vanishing” or “social policy” presumption, it is essential to understand the law of resulting trusts. Traditionally, a resulting trust arises “where the purchase money of land is paid by one person, and the title is taken in the name of another, the party taking the title is presumed to hold it in trust for him who pays the purchase price.” Pyle v. Pyle, 53 So.2d 312, 313-14 (Fla.1951) (citation omitted).
We acknowledge the equitable nature of a resulting trust, but do not find it to be one that promotes a legally recognized social policy. As such, the presumption in this case is a “vanishing” one. The evidence must now be reviewed to determine whether the presumption in fact vanished. Given the facts of .this case, our review is relatively straightforward.
To be entitled to the presumption at all, Local 500 had the burden to prove Local 646 actually paid for, or obligated itself to pay for, the property at the time of the purchase, intending the creation of a trust relationship. See, e.g., Wadlington v. Edwards, 92 So.2d 629 (Fla.1957). The Holding Company, however, introduced evidence that Robinson, a member of Local 646, mortgaged the property in his own name, as trustee for the members of Local 646. He also obtained another purchase money mortgage in his own name. Importantly, the record is devoid of any evidence suggesting Local 646 ever agreed to indemnify Robinson in the event of a default on either loan. While this did not eliminate the issue of fact as to whether a resulting trust existed, it caused the presumption of a resulting trust to vanish.
Because the presumption vanished, the trial court correctly denied Local 500’s request for an instruction on the presumption of a resulting trust and correctly instructed the jury on the elements necessary to establish a resulting trust. In fact, the instruction given was nearly identical to the instruction agreed upon by the parties and included in the pretrial stipulation. We find no error in the trial court’s instructions. Unfortunately for Local 500, the jury, as fact finder, did not find a resulting trust to have existed.
The second issue concerns the trial court’s refusal to submit a special multi-part interrogatory verdict form to the jury. Local 500 suggests that without the special verdict form, the jury was unable to make specific factual findings that would have resulted in a favorable verdict to Local 500 on the resulting trust claim. We disagree.
The use of a special interrogatory verdict form is within the sound discretion of the trial court and its decision should not be disturbed on appeal absent prejudicial error. Triana v. Fi-Shock, Inc., 763 So.2d 454 (Fla. 3d DCA 2000) (citing Goldschmidt, v. Holman, 571 So.2d *965 422, 425 (Fla.1990)). Generally, verdict forms should “parallel the court’s instruction on the law and not give undue prominence to any single issue in the case.” Botte v. Pomeroy, 497 So.2d 1275, 1280 (Fla. 4th DCA 1986). Trial courts must ensure the verdict form addresses all claims and cross-claims equally and does not give undue weight to any one claim or defense. See id.
While the verdict form did not ask the jury a specific question with regard to each element of a resulting trust, as we previously held, the jury was properly instructed on those elements. In fact, the jury was provided with three complete copies of the instructions to utilize during its deliberations. The verdict form simply asked the jury to determine if a resulting trust existed. The jury answered the question in the negative. We find no error in the verdict form submitted.
AFFIRMED.
WARNER and GROSS, JJ., concur.

. We note that a resulting trust is an equitable remedy. See Sorrels v. McNally, 89 Fla. 457, 105 So. 106 (1925); Brake v. Murphy, 687 So.2d 842 (Fla. 3d DCA 1997). Here, legal and equitable issues were "intertwined” so there was no error in submitting such fact issues to the jury. See Billian v. Mobil Corp., 710 So.2d 984 (Fla. 4th DCA 1998). Also, unlike Chabad House-Lubavitch of Palm Beach County, Inc. v. Banks, 602 So.2d 670 (Fla. 4th DCA 1992), this was not a case where any party objected to "equitable [fact] issues being determined by the jury.”